(Decided October 28th, 1898.)

---

THE STANDARD HORSESHOE COMPANY OF SOUTH WAREHAM, MASS. *vs.* BERNARD J. O'BRIEN AND FRANK O. SINGER, JR.

*Fraud—Purchase by Insolvent—Sufficiency of Evidence— Rights of Defrauded Vendor—Form of Verdict in Replevin—Appeal.*

Defendant, the acting member of a firm, stated to the plaintiff that he had a cash capital of two thousand dollars. After making a voluntary transfer of one-half of this sum to his

partner, defendant bought from plaintiff on credit, goods to the amount of twenty-six hundred dollars. Soon after, he made an assignment for the benefit of creditors. *Held,* that there is legally sufficient evidence from which a jury may find that defendant was insolvent and knew he was insolvent, and had no reasonable expectation of paying for the goods so purchased.

When goods are bought on credit by a person then insolvent, who has no reasonable expectation of paying for them, he commits a fraud which entitles the seller to rescind the contract and sue in replevin for the goods.

Code, Art. 75, sec. 111, provides that every verdict in replevin shall ascertain separately the value of the goods, and the damages, if any, for their detention. *Held,* that a verdict in favor of the defendant for the return of the property replevied and one cent damages, is erroneous.

No objection can be made on appeal on account of the irregularity of the verdict, unless there be a motion in arrest of judgment; Code, Art. 5, sec. 9, providing that this Court shall not decide any question that does not appear to have been tried by the Court below.

Appeal from the Superior Court of Baltimore City (DENNIS, J.), where the case was tried without a jury. The trial Court ruled, as matter of law, " that there is no evidence in this case legally sufficient to show any fraud in the purchases by O'Brien & Co., of the horse-shoes replevied in this case, entitling the plaintiff to rescind the sales therof, and therefore the verdict of the Court sitting as a jury must be for the defendants." The verdict, as rendered, was " in favor of defendant for the return of the property replevied and one cent damages and costs." Judgment on verdict. Code, Art. 75, sec. 111, provides that every judgment in detinue and replevin and every verdict thereon shall ascertain separately the value of the goods and chattels, and the damages, if any, for their detention.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BOYD and PEARCE, JJ.

*Richard Bernard* and *Alfred S. Niles*, for the appellant.

*S. S. Field* (with whom was *Harry C. Gaither* on the brief), for the appellee.

BRYAN, J., delivered the opinion of the Court.

This was an action of replevin brought by the appellant against the appellees. It was maintained that certain kegs of horseshoes had been fraudulently purchased by the defendant, O'Brien, from the plaintiff, and that consequently it had the right to rescind the contract of sale, and take the horseshoes under a writ of replevin. At the close of the plaintiff's case the Court granted an instruction that there was no evidence of fraud, and that the verdict must be for the defendants. Verdict and judgment having been rendered, the plaintiff has appealed.

O'Brien & Co. had on two or three occasions purchased horseshoes from the plaintiff, and they desired a more extensive credit. The statements made by O'Brien to Cook, a salesman in the employment of the plaintiff, constitute one of the grounds of the allegation of fraud. It is insisted that these statements were false. It is important to consider carefully this evidence. We shall state the material part of it as it appears in the record. It is contained in Cook's testimony as follows: " That he, Cook, came on to Baltimore to look into O'Brien & Co.'s standing, and determine to what extent to trust them; he then, on or about February 17, 1896, had a personal interview with O'Brien, in which he, O'Brien, stated that he had a cash capital of $2,000, which had been contributed to the business by James W. Amoss, that Amoss was backing him, and that he, Amoss, was to have a share in the profits, and that Amoss had contributed the $2,000 against his, O'Brien's, experience. On the strength of the representations made to him by O'Brien, he determined to give him the desired credit, and agreed to furnish him shoes at $3 per keg, f. o. b. Baltimore, with an additional discount of ten per cent., provided fifteen hundred kegs per year

were sold; that he reported to his company that O'Brien had a clear cash capital of $2,000 in the American National Bank, and on the strength of these representations the line of credit given by the company to O'Brien & Co. was given." O'Brien was examined as a witness for the plaintiff. He stated that he commenced business in July, eighteen hundred and ninety-five. He further stated in his testimony: "I started business at that time in conjunction with Mr. James W. Amoss and Samuel Morrison, Mr. Amoss furnishing the capital of two thousand dollars; I earning a salary of eighteen dollars per week; Mr. Morrison having the privilege of coming in as a partner at the end of two or three years"; and also "Mr. Amoss having put the capital against my knowledge of the business I told him I looked upon him as the principal in the business." He also stated that he understood that Amoss owned the "*corpus of the business.*" It was also shown by the testimony of the cashier of the American National Bank and by the production of the bank book of O'Brien & Co., that the firm opened an account in July, eighteen hundred and ninety-five, by a deposit of two thousand dollars, which could be drawn on at any time by O'Brien & Co. It was shown that there was an understanding between O'Brien and Amoss, that O'Brien should draw on the deposit only to the extent of a thousand dollars. The cashier testified that Amoss requested him not to permit O'Brien to draw his account below two thousand dollars, but it had been permitted. The account was closed in May, 1897. During its continuance the deposits had amounted to over eighteen thousand dollars. According to O'Brien's testimony Amoss was a partner in the business; and although there was a restriction on O'Brien's right to draw on the deposits in the bank, they belonged to the firm of O'Brien & Co. The restriction on the right of one member of the firm to draw is a matter which the partners have a right to regulate by agreement with each other, but it cannot affect the firm's ownership of the funds. The whole of the money in bank was subject to the partnership debts, and by appropriate

proceedings could have been subjected to the payment of them. According to the testimony in the case the statement made by O'Brien to Cook was strictly true.

But there was testimony on other points. Cook testified that in the summer or early fall of eighteen hundred and ninety-six he said to Amoss that O'Brien & Co. had gotten slow in their accounts, and that the plaintiff did not feel like carrying them along unless they were safe, and that Amoss then promised to stand by the firm if it should need any financial assistance. In January, 1897, Amoss obtained from O'Brien the check of the partnership for $1,000, which was duly paid by the American National Bank. There was no consideration for this check moving from Amoss to the partnership. It is evident from the testimony of O'Brien that the withdrawal of this money from the funds of the firm was a serious injury to it, and that thereafter it was incapable of carrying on its business on the same scale as formerly. In February and March the partnership purchased from the plaintiff 464 kegs of horseshoes at the price of $1,392. Some short time afterwards O'Brien, at the suggestion of Amoss, made a deed of trust conveying the partnership effects to Frank O. Singer, Jr. This deed is spoken of in the evidence, but it is not set forth in the record, and we are not able to ascertain its contents, or even its date. On May 14, a note of O'Brien & Co. due to the plaintiff for goods sold went to protest. The amount of the note was a hundred and fifty dollars. The replevin was issued on the 20th of May for four hundred and sixty-four kegs of horseshoes. Since the issue of the replevin five other notes have been protested, which were due from O'Brien & Co. to the plaintiff, and the indebtedness of the firm to the plaintiff is more than twenty-six hundred dollars. This sum includes the amount at which the replevined goods were purchased. Of course, if the sale of those goods is rescinded, the price of them must be deducted from the indebtedness. We think that the portions of the testimony which we have mentioned contain evidence from which it was competent for a jury to find that the firm

of O'Brien & Co. disabled itself for the continuance of its business by the voluntary transfer of a thousand dollars to one of the partners, and that at the time of the purchase of the four hundred and sixty-four kegs of horseshoes, O'Brien (who was then acting as the sole member of the firm of O'Brien & Co.), was insolvent, and knew that he was insolvent, and had no reasonable expectation of paying for the goods purchased.

If he made the purchase under these circumstances, he committed a fraud which authorized the plaintiff to rescind the contract of sale; and if these facts were found by a jury the plaintiff would be entitled to a verdict. When we speak of a jury, it will not be supposed that we forget that the learned Judge who presided below was trying the facts in the place of a jury. And of course, it will not be thought that we have expressed any opinion on the facts, or upon the proper inference from them. We could not discuss the legal sufficiency of the evidence without assuming for the purposes of the discussion that the testimony was true, and without pointing out the inferences which it was within the function of a jury to draw; not intimating in any way how a jury ought to find the facts, or suggesting what inferences they ought to draw. The whole question is by the law committed to their judgment.

As there must be a new trial it is not important for the purposes of this case that we should say anything about the form of the verdict. It may, however, be useful in some other case, if we say, although the verdict is irregular and untechnical in form, that we could not consider such a question unless it was brought before us, by a motion in arrest of judgment. Without elaborating the subject, we will simply refer to *Cushwa* v. *Cushwa's lessee*, 5 Md. 54, where an irregular verdict had been rendered in an action of ejectment. The court say: " Because the verdict gave $500 damages, it is contended that inasmuch as no such damage could be legally given in an action of ejectment, the judgment is erroneous, although in accordance with the verdict, and therefore should be reversed. But no question on this

subject was raised below, and no motion in arrest of judgment having been made, the Act of 1825, ch. 117, will not allow such a question to be raised in this Court."

*Reversed and new trial.*

(Decided November 1st, 1898.)